UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

TANYA S.[1],                                    )
                                                )
          Plaintiff,                            )
                                                )
v.                                              )     CIVIL NO. 2:21cv38
                                                )
KILOLO  KIJAKAZI, Acting                        )
Commissioner of Social Security,                )
                                                )
          Defendant.                            )

OPINION AND ORDER

This matter is before the court for judicial review of a final decision of the defendant

Commissioner of Social Security Administration denying Plaintiff's applications for Disability

Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. § 423(d), and for

Supplemental Security Income (SSI) under Title XVI of the Act, § 1383(c)(3). Section 205(g) of

the Act provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a certified

copy of the transcript of the record including the evidence upon which the findings and decision

complained of are based.  The court shall have the power to enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing the decision of the

[Commissioner], with or without remanding the case for a rehearing."  It also provides, "[t]he

findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be

conclusive. . . ."  42 U.S.C. §405(g).

The law provides that an applicant for disability benefits must establish an "inability to

engage in any substantial gainful activity by reason of any medically determinable physical or

---

[1] For privacy purposes, Plaintiff's full name will not be used in this Order.

mental impairment which can be expected to last for a continuous period of no less than 12

months. . . ."  42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental impairment

is "an impairment that results from anatomical, physiological, or psychological abnormalities

which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."

42 U.S.C. §423(d)(3).  It is not enough for a plaintiff to establish that an impairment exists.  It

must be shown that the impairment is severe enough to preclude the plaintiff from engaging in

substantial gainful activity.  *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372

U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979).  It is well established that

the burden of proving entitlement to disability insurance benefits is on the plaintiff.  *See Jeralds*

*v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record

as a whole contains substantial evidence to support the [Commissioner's] findings."  *Garfield v.*

*Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786

(7th Cir. 1982); 42 U.S.C. §405(g).  "Substantial evidence is defined as 'more than a mere

scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting

*Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*,

552 F.2d 781, 784 (7th Cir. 1977).  "If the record contains such support [it] must [be] affirmed,

42 U.S.C. §405(g), unless there has been an error of law."  *Garfield*, *supra* at 607; *see also*

*Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law

Judge ("ALJ") made the following findings:

2

1.      The claimant meets the insured status requirements of the Social Security Act through September 30, 2019.

2.      The claimant has not engaged in substantial gainful activity since February 15, 2018, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.      The claimant has the following severe impairments: degenerative disc disease, lumbar stenosis, diabetes mellitus, and adhesive capsulitis and impingement syndrome of the right shoulder (20 CFR 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work, that is lift and/or carry and push and/or pull up to 10 pounds occasionally and less than 10 pounds frequently; stand and/or walk for about two hours in an eight-hour day; and sit for about six hours in an eight-hour day. She can never climb ladders, ropes, or scaffolds or crawl, but can occasionally climb ramps and stairs. She can frequently stoop, kneel, and crouch. She can occasionally reach overhead with the right upper extremity.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on July 21, 1975 and was 42 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date. The claimant subsequently changed age category to a younger individual age 45-49 (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969,

and 416.969(a)).

(Tr. 12-16).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to benefits, leading to the present appeal.

Plaintiff filed her opening brief on October 28, 2021.  On December 9, 2021 the defendant filed a memorandum in support of the Commissioner's decision to which Plaintiff replied on December 23, 2021.  Upon full review of the record in this cause, this court is of the view that the Commissioner's decision should be remanded.

A five step test has been established to determine whether a claimant is disabled.  *See Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987).  The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order:  (1)  Is the claimant presently unemployed?  (2)  Is the claimant's impairment "severe"?  (3)  Does the impairment meet or exceed one of a list of specific impairments?  (4)  Is the claimant unable to perform his or her former occupation?  (5)  Is the claimant unable to perform any other work within the economy?  An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled.  A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).   In the present case, Step 5 was the determinative inquiry.

Plaintiff filed an application for DIB and SSI on June 18, 2018, alleging disability

4

beginning February 15, 2018. (Tr. 10.) Plaintiff's claim was initially denied on September 15,

2018. Plaintiff requested reconsideration but was again denied on January 16, 2019. (Tr. 10.) On

December 9, 2019, Plaintiff appeared for a hearing before ALJ Robert Long. (Tr. 9-10.)

Vocational expert ("VE") Jacqueline Bethell testified at this hearing. (Tr. 51.) After the hearing,

the ALJ collected interrogatory answers from VE Bethell, and Plaintiff requested a supplemental

hearing, which was held by phone on October 8, 2020. (Tr. 10, 386.) VE Thomas Grzesik

testified at this hearing. (Tr. 26.)  The ALJ issued an unfavorable decision on October 27, 2020.

(Tr. 7.) Plaintiff filed a request for review by the Appeals Council, which denied the request on

November 19, 2020. (Tr. 1.)

Plaintiff was born on July 21, 1975 and was 42 years old on her alleged onset date. (Tr.

15.) She has past relevant work as a certified nursing assistant. (Tr. 15.)

Plaintiff saw her primary care provider (PCP) on January 11, 2017 to follow up on

diabetes and hypertension, but she also complained of right shoulder pain. (Tr. 687, 696.)

Examination demonstrated discomfort on range of motion in the right shoulder. (Tr. 697.) X-rays

of the right shoulder on the following date were normal. (Tr. 700). Plaintiff complained of

neuropathy, depression and anxiety, and severe right shoulder pain to her PCP on March 31,

2017. (Tr. 540.) On examination, she had painful range of motion of the right shoulder but full

strength. (Tr. 546.) On May 22, 2017, a physical exam demonstrated right shoulder tenderness

and mildly reduced range of motion, and an MRI was ordered. (Tr. 532, 537.) She attended an

orthopedic consultation with Dr. Kishan Chand on July 18, 2017. (Tr. 568.) Dr. Chand provided

an injection into the right shoulder and again requested an MRI. (Tr. 568.) A right shoulder MRI

on August 28, 2017 showed moderate hypertrophy of the acromioclavicular joint with minimal

impingement, signal changes within the supraspinatus tendon that appeared to represent a partial thickness tear, and the appearance of mild tendinopathy of the supraspinatus tendon. (Tr. 453-54.)

Plaintiff saw her PCP on October 16, 2017 for depression, among other concerns. (Tr. 505.) Her PHQ-9 score was 11, and her GAD score was 9. (Tr. 505.)

Plaintiff complained of lower back pain on the right side to her PCP on January 12, 2018. (Tr. 494.) Physical exam was normal. (Tr. 500.) X-rays of the lumbar spine were unremarkable. (Tr. 504.) She went to the emergency department on February 6, 2018 for left lower back pain that she had experienced intermittently over the past two weeks. (Tr. 427.) She exhibited tenderness to palpation in her left upper leg, and she had a positive straight leg raise test on the left. (Tr. 431.) She followed up with her primary care provider on February 8, 2018, and physical exam again demonstrated a positive straight leg raise test to the left, as well as moderate pain with motion in the lumbar spine. (Tr. 487, 492.)

 X-rays of the lumbar spine on February 15, 2018 showed very minimal scoliosis of the lumbar spine convex to the right and very mild degenerative changes of the facet joints at L3-4, L4-5, and L5-S1. (Tr. 460.) A lumbar spine MRI on March 8, 2018 showed degenerative disc disease with left paracentral disc protrusion at L5-S1 with mild compression of the thecal sac and facet joint arthropathy without stenosis. (Tr. 629.)

Plaintiff saw pain management specialist Sheel Patel at the Centers for Pain Control on April 4, 2018 to address her lower back pain. (Tr. 582-86.) She also reported severe neck pain. (Tr. 582.) On examination, Dr. Patel observed that Plaintiff was in moderate acute distress and ambulated with difficulty, exhibiting guarding and antalgic behavior. (Tr. 584.) She had moderate to severe pain with range of motion of the cervical spine, and she exhibited severe pain with

6

range of motion of the lumbar spine. (Tr. 585.) Straight leg raise testing was positive bilaterally.

Dr. Patel increased gabapentin and slightly decreased tramadol while also ordering physical

therapy. (Tr. 585.) Plaintiff returned to Dr. Patel on May 2, 2018 after starting physical

therapy, complaining of continued pain without any significant changes. (Tr. 600.) She appeared

to be in mild to moderate acute distress, ambulated with difficulty, and exhibited guarding and

antalgic behavior. She had moderate to severe pain on range of motion in the lumbar and cervical

spine. Straight leg raise testing was positive bilaterally. (Tr. 600.) Dr. Patel increased the tramadol

to her prior dose, and he planned to see her back in two weeks to review progress after

completing physical therapy. (Tr. 601.) She returned on May 17, 2018, at which time Dr. Patel

observed moderate acute distress, ambulation with difficulty, guarding and antalgic behavior,

moderate to severe pain on range of motion in the lumbar spine, and a positive straight leg raise

test on the left. (Tr. 933.) He was also able to review the March 2018 lumbar spine MRI. (Tr.

933.) He planned a diagnostic transforaminal injection at the L5-S1 level. (Tr. 934.)

At a follow-up appointment with Dr. Patel on June 6, 2018, Plaintiff reported that she had

near-complete resolution of pain for at least four to six hours, along with a dramatic increase in

functional capacity, although after that time the pain slowly and steadily returned to baseline. (Tr.

620.) She was in moderate acute distress, ambulated with difficulty, and exhibited guarding and

antalgic behavior on exam. She had severe pain on range of motion in the lumbar spine. Straight

leg raise testing was positive on the left. (Tr. 620.) Dr. Patel planned a repeat transforaminal

epidural injection, this time utilizing a therapeutic dose of steroid. (Tr. 621.) He expected this to

provide several months of "very good relief." (Tr. 621.) After this injection, Plaintiff saw Dr.

Patel again on June 28, 2018, reporting an elimination of radicular pain into her lower extremities

but still experiencing 9/10 pain in her back. (Tr. 623.) On examination, ambulation and "certain activities" were guarded, and she still had significant pain on range of motion in the lumbar spine, but she exhibited no radicular symptoms. (Tr. 623.) Dr. Patel planned a diagnostic block of the medial branch nerves to address her continued back pain. (Tr. 624.) He also added tizanidine to address muscle spasms. (Tr. 625.)

Plaintiff saw orthopedist Ashish Patel on July 31, 2018, stating that she continued to have low back pain with some mild leg pain, and Dr. Patel encouraged physical therapy. (Tr. 865-66.)

Plaintiff returned to the Centers for Pain Control on August 16, 2018, this time seeing Dr. Simon Ho. (Tr. 626-28.) She reported that in the last few weeks, she had increasing radicular pain in both legs that was as significant as it had been before. (Tr. 626.) She ambulated with difficulty, she exhibited guarding and antalgic behavior, she had severe pain on range of motion in the cervical spine, and she had positive straight leg raising tests bilaterally. (Tr. 627.) Dr. Ho planned a repeat epidural injection via the interlaminar route at L5-S1 and continued her medications. (Tr.627.)

Dr. R. Gupta conducted a physical consultative examination of Plaintiff on September 4, 2018. (Tr. 635-38.) Dr. Gupta observed spinous and paraspinal tenderness in the lumbar and cervical region, restricted range of motion in the lumbar spine with full range of motion in the cervical and thoracic region, and pain and stiffness in the right shoulder with decreased range of motion. (Tr. 637.) Plaintiff was not able to walk heel-to-toe or tandemly without difficulty. (Tr. 637.)

Plaintiff followed up with Dr. Ho on October 9, 2018, reporting good relief from the lumbar epidural steroid injection, with the elimination of radicular pain and back pain at 5/10.

(Tr. 860.) However, she still had significant pain on range of motion in the lumbar spine. (Tr. 862.) Dr. Ho planned a diagnostic block of the medial branch nerves to address the back pain. (Tr. 862.)

Plaintiff returned to Dr. Ho on November 8, 2018. (Tr. 962.) She reported a substantial reduction in pain for at least five hours after the injection, with a return to baseline after that time. (Tr. 964.) Dr. Ho planned a repeat diagnostic block of the same medial branch nerves. (Tr. 965.)

Plaintiff attended an orthopedic consult at Lakeshore Bone and Joint Institute on November 26, 2018 to address her chronic right shoulder pain. (Tr. 973.) Orthopedic surgeon Thomas Kay observed diffuse tenderness to palpation surrounding the right shoulder with mildly limited passive motion and tenderness throughout the arc of motion, a positive impingement test, and a positive apprehension test. (Tr. 974.) He provided an injection of Depo Medrol into the right shoulder and told Plaintiff to continue ibuprofen. (Tr. 974.)

Plaintiff followed up with Dr. Ho on December 6, 2018, reporting yet another substantial reduction of pain for at least two hours with a return to baseline afterward, so the doctor planned a therapeutic radiofrequency ablation of the same medial branch nerves. (Tr. 1037, 1039-40.) Following this injection, Plaintiff returned on February 8, 2019. (Tr. 1044.) She still had significant left-sided axial lumbar pain that was exacerbated by prolonged standing, sitting, and excessive activity but alleviated by rest. (Tr. 1046.) On examination, ambulation and "certain activities" were guarded, she had significant pain with range of motion in the lumbar spine, and she had "a little area of irritation" on the right side with "some significant tenderness to palpation" on the left. Dr. Ho planned another diagnostic medial branch nerve block. (Tr. 1046.)

9

Plaintiff followed up on March 1, 2019. (Tr. 1051.) Dr. Ho acknowledged that the "results have been a little bit equivocal," and that Plaintiff continued "to have some of the pain right now and she is a little discouraged." (Tr. 1053.) Plaintiff was offered a couple options on how to proceed, and she wanted some time to think it over, while she also hoped that surgical treatment might now be an option outside of the pain management practice. (Tr. 1053.) She went back to Dr. Ho on April 26, 2019. (Tr. 1055.) She was not able to have a surgical reevaluation in the interim. (Tr. 1057.) Dr. Ho noted that she remained "on the significant dosage of the tramadol, actually maximum dosage." Her symptoms were about the same. Dr. Ho continued her on the tramadol at that time, although he remarked, "It is not a good answer simply to stay on the tramadol forever, so hopefully we will have some definitive treatment." (Tr. 1057.)

At the hearing,  Plaintiff testified that she lived with her fiancé and his son, and she graduated from high school with about three years of college education. (Tr. 55-56.) She reported a past work history as a certified nursing assistant in which she had to lift at least 100 pounds throughout every shift. (Tr. 56.) She said that she spent her days trying to do laundry, to clean, and to cook, although she had "good days and bad days, of course." (Tr. 57.) On a good day, she could stand for about two hours, but if "standing in one place" and "not moving," she could only do so for about half an hour before having to sit down. (Tr. 58.)  She could sit for a couple hours before having to stand and stretch. (Tr. 59.) She could walk about a block on a good day. (Tr. 59.) She could lift and carry about ten pounds. (Tr. 60.) She said she could not carry a gallon of milk "for very long." (Tr.60). She said she sometimes used a cane. (Tr. 68.) She said she used a cart for mobility at the store. (Tr. 68.) She reported needing help with fastening her bra because she had problems reaching behind her back. (Tr. 71.) She said that putting her shoes on was "the one

10

thing" she thought she could do, apparently in the context of reaching. (Tr. 71).

As the VE testimony is a crucial part of Plaintiff's request for remand, it will be discussed here in depth. VE Bethell classified Plaintiff's past work as a medium-exertion, semiskilled certified nursing assistant that Plaintiff performed at the very heavy level. (Tr. 72.) The ALJ asked whether an individual could still perform Plaintiff's past work if limited to light work with occasional climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; frequent stooping, kneeling, and crouching; and no crawling. (Tr. 73.) The VE said that past work was eliminated but other jobs were available. The ALJ next added a limitation to occasional reaching overhead with the right upper extremity, and the VE said that the previously provided jobs would remain. (Tr. 73.) Further limiting the hypothetical to occasional reaching in all directions with the dominant right upper extremity would eliminate all light work. (Tr. 73-74.) The ALJ then returned to the original hypothetical and reduced it to the sedentary level. (Tr. 74.) The VE provided jobs as a call-out operator, a stuffer, and a circuit board assembler, with a total of 74,300 jobs in the national economy. (Tr.74.) The ALJ added a limitation to occasional reaching overhead with the right upper extremity. (Tr. 74). The VE said that those jobs would remain. (Tr. 75.) Plaintiff's representative asked about the impact of a limitation to sedentary work with occasional reaching in all directions with the dominant right upper extremity. (Tr. 75.) The VE said that this would eliminate the sedentary jobs. (Tr. 76.) Requiring that an individual alternate between sitting and standing every 20 minutes would not be tolerated by employers. A person who could not sit, stand, or walk for a total of eight hours in an eight-hour workday would be unable to work full-time. (Tr. 76.) Employers allowed one absence per month or ten to fourteen absences per year. (Tr. 77.) Additionally, employers allowed for 10% to 15% of time off task. (Tr.

77.)

The ALJ submitted interrogatories to VE Bethell, who replied on January 15, 2020. (Tr. 372-86.) In the interrogatories, the ALJ asked whether an individual could perform Plaintiff's past work if limited to light work with no climbing of ladders, ropes, or scaffolds; no crawling; occasional climbing of ramps and stairs; and frequent stooping, kneeling, and crouching. (Tr. 373.) The VE said that past work was precluded but jobs as a housekeeping cleaner, a cafeteria attendant, and a mail clerk were available. (Tr. 373-74.) The ALJ added a limitation to occasionally reaching overhead with the right upper extremity. (Tr. 375.) The VE said that the same jobs remained in the same numbers. (Tr. 376.) The ALJ further limited the hypothetical to occasional reaching in all directions with the right upper extremity. (Tr. 377.) The VE answered that jobs as a sales attendant, an usher, and an order caller were available. (Tr. 378.) The ALJ next posed a hypothetical limitation to sedentary work with no climbing of ladders, ropes, or scaffolds; no crawling; occasional climbing of ramps and stairs; and frequent stooping, kneeling, and crouching. (Tr. 379.) The VE provided jobs as a circuit board assembler, a document specialist, and an addresser, totaling about 70,000 jobs in the national economy. (Tr. 380.) The ALJ added a limitation to occasional reaching overhead with the right upper extremity. (Tr. 381.) The VE said that the same jobs remained in the same numbers. (Tr. 382.) The ALJ asked whether adding a limitation to changing position every 20 minutes would affect the jobs available under any of the hypotheticals, and the VE replied that the sedentary jobs would remain available. (Tr. 383-85.) The VE said that employers typically allowed one absence per month and 10% to 15% of time off task. (Tr. 386.)

The supplemental hearing, held on October 8, 2020 by phone, was primarily oriented

around additional vocational expert testimony, with VE Grzesik testifying. (Tr. 32.) VE Grzesik agreed with the prior classification of Plaintiff's past relevant work. (Tr. 33.) The ALJ then asked whether an individual could perform that past work if limited to light work with no climbing of ladders, ropes, or scaffolds; no crawling; occasional climbing of ramps and stairs; and frequent stooping, kneeling, and crouching. (Tr. 33.) The VE said that the past work would not be available, but such an individual could perform other work. (Tr. 33-34.) The ALJ next added occasional reaching overhead with the right upper extremity, and the VE said that the available jobs would not be impacted. (Tr. 34.) The ALJ further limited to occasional reaching in all directions, and the VE said that the occupations he previously cited would be precluded, but a couple of light jobs and sedentary work would be available, with a total of 45,000 jobs in the national economy between those three positions. (Tr. 34-36.)

The ALJ provided a new hypothetical for an individual who was limited to sedentary work with no climbing of ladders, ropes, or scaffolds; no crawling; occasional climbing of ramps and stairs; and frequent stooping, kneeling, and crouching. (Tr. 36.) The VE provided three positions—an order clerk, an information clerk, and a call-out operator—totaling 53,000 jobs in the national economy. (Tr. 36-37.) The ALJ's final hypothetical added to the previous sedentary hypothetical a limitation to occasional reaching overhead with the right upper extremity. (Tr. 37.) The VE said that this would not impact the jobs available under the previous hypothetical. (Tr. 37.) The VE noted that two of the jobs provided required frequent reaching per the DOT, while only one required no more than occasional reaching. (Tr. 37-38.) He addressed the conflict with the DOT by stating, "The DOT isn't clear with respect to unilateral, bilateral use of the upper extremities, nor the range of motion which would include overhead. My response to the overhead

reach is based on my professional experience in placing individuals in jobs and analyzing jobs. And, it is my opinion that the jobs I cited could still be performed due to, in my opinion, there is no overhead reaching involved." (Tr. 38.)  Plaintiff's representative asked how the VE determined the number of jobs available, having noted that "call-out operator," for instance, involved compiling credit information and suggesting that such a job would be largely automated now. (Tr. 39.) Rather confusingly, VE Grzesik answered:

> Those numbers begin with the US Department of Labor occupation employment statistics for the national numbers of jobs that are classified under the standard occupational classification groupings. Those numbers and those titles are then crosswalked through the O*NET and the O*NET then can break down within the SOC various DOT codes. It's through the, through professional discretion, certain DOT codes are eliminated due to them no longer existing, and then it's a matter of assigning a percentage to a particular DOT coding question and multiplying that percentage times the gross amount in the appropriate SOC code to come up with the number of jobs for the DOT.

(Tr. 39-40.) The VE acknowledged that job descriptions in the DOT had not been updated since about 1991. (Tr. 40.) He nonetheless insisted that the jobs he cited "pretty much remain the same throughout time." (Tr. 40.)

Plaintiff's representative asked that the VE clarify how he determined how many jobs within a particular O*NET grouping fall within a single DOT code under that grouping, and the VE said, "It's based on my, my own discretion and, you know, based on my experience in placing individuals and analyzing jobs as well. And as you mentioned, it is an estimate. There is no pure number that one could actually assign." (Tr. 41-42.) The VE said he had "probably" placed someone in a job like the call-out operator "within the last three years or so" and suggested that "Meryl [sic] Lynch would be one such place." (Tr. 42.) Plaintiff's representative asked whether the "information clerk" job was still performed as described, noting that the DOT code referenced

14

described a "telephone quotation clerk" who provided a stock price when called. The VE said,

"Yes, and that's why the numbers are so limited for the usage again that there is [sic]. As you

know, most of the [trading] information is essentially electronic. However, certain information

needs to be sent to the particular, you know, trading exceptions, and that's where those numbers

come from." (Tr. 42.) The VE insisted that "the basic responsibilities and duties would be the

same, even though there was some evolution with respect to technology." (Tr. 43.)

Plaintiff's representative asked whether an employer would permit an individual to change

position every 20 minutes between sitting and standing with one to two minutes off task with

each transition. (Tr. 43.) The VE said that such a requirement would not be permitted. (Tr. 44.)

The VE testified that light jobs allowed between 10% and 15% of time off task, while sedentary

jobs allowed only about 10% of time off task. (Tr. 44.) He also testified that employers tolerated a

range of between about half a day to one day per month and six days to twelve days per year in

absences. (Tr. 45.)

After the hearing, Plaintiff's representative submitted a "contention" in which he

highlighted apparent contradictions between VE Grzesik's testimony and the sources upon which

he purported to rely. (Tr. 397-401.) This "Contention Regarding Recent Hearing" is a concise,

well-written, persuasive, point-by point rebuttal to VE Grzesik's testimony regarding the various

jobs he testified were available.

In support of remand, Plaintiff first argues that the ALJ erred by failing to address

conflicts between the VE testimony and the DOT. SSR 00-4p states:

> When there is an apparent unresolved conflict between VE or VS evidence and the
> DOT, the adjudicator must elicit a reasonable explanation for the conflict before
> relying on the VE or VS evidence to support a determination or decision about

15

whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

Furthermore, "Neither the DOT nor the VE or VS evidence automatically 'trumps' when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information." *Id*.

VE Bethell, the first VE, originally testified that 74,300 sedentary, unskilled jobs were available in the national economy for a worker limited to sedentary work with occasional climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; frequent stooping, kneeling, and crouching; no crawling; and occasional reaching overhead with the right upper extremity. (Tr. 74-75.) Further reducing such a hypothetical worker to occasional reaching in all directions with the right upper extremity would eliminate sedentary work. (Tr. 76.)  VE Bethell also testified that requiring that an individual alternate between sitting and standing every 20 minutes would not be tolerated by employers. (Tr. 76).

In response to interrogatories, VE Bethell provided about 70,000 jobs in the national economy for an individual limited to sedentary work with no climbing of ladders, ropes, or scaffolds; no crawling; occasional climbing of ramps and stairs; frequent stooping, kneeling, and crouching; and occasional reaching overhead with the right upper extremity. (Tr. 379-82.) While VE Bethell had previously stated that alternating position every 20 minutes would be work-preclusive, she now indicated that sedentary jobs would still be available with this limitation. (Tr. 383-85.)

VE Grzesik, the second VE, testified at the supplemental hearing that there were about

53,000 jobs in the national economy for an individual limited to sedentary work with no climbing

of ladders, ropes, or scaffolds; no crawling; occasional climbing of ramps and stairs; frequent

stooping, kneeling, and crouching; and occasional reaching overhead with the right upper

extremity. (Tr. 36-37.) He opined that shifting positions every 20 minutes with one to two

minutes off-task during each transition would be work-preclusive. (Tr. 43-44.)

Plaintiff claims that the VE testimony was a "grab bag of inconsistent responses" and that

the ALJ should have to resolved the conflict in this testimony. Plaintiff argues that, when asked a

basic question about the methodology behind his job number estimation, VE Grzesik provided a

convoluted non-answer. (Tr. 39-40.) Plaintiff points out that the VE did not explain what

"professional discretion" meant or how he could have an appropriate method for determining

which DOT codes were nonexistent or which "percentage" to assign a particular DOT code.

Plaintiff claims that there is no data source or methodology, outside "professional discretion," for

deciding the availability of DOT jobs. Plaintiff further claims that VE Grzesik's "professional

discretion" appeared rather suspect, as he insisted, for example, that the DOT's "telephone

quotation clerk," a person providing stock prices when called, still existed as a sedentary,

unskilled job despite the automation of stock market data and that the DOT's "call-out operator"

existed because he "probably" placed someone in a job like that "within the last three years or

so."[2] (Tr. 42-43.) It was this "professional discretion" that VE Grzesik used to explain the conflict

---

[2] As a practical matter, it is hard to imagine that Plaintiff, a 46 year old certified nurse assistant with a bad back and a bad shoulder, is going to miraculously find a job at Merrill Lynch (or someplace similar) as a call-out operator or a telephone quotation clerk, even if these jobs still exist, which is highly doubtful. The Court recognizes that, ironically, whether Plaintiff could actually get hired at any of the identified jobs is irrelevant to the analysis. Thus it is doubly important for the Court to be assured that the identified jobs do, in fact, actually exist.

with the DOT regarding reaching, as he noted that two of the jobs provided at the sedentary level required frequent reaching in the DOT but he believed that occasional overhead reaching in particular was not required in those jobs based on unspecified "experience in placing individuals in jobs and analyzing jobs." (Tr. 37-38.)

The Seventh Circuit has expressed skepticism regarding how "unspecified past experience and 'knowledge' could enable [a VE] to determine numbers of particular jobs." *Herrmann v. Colvin*, 772 F.3d 1110, 1113 (7th Cir. 2014). Other Circuits have found that ALJs have an affirmative duty to identify apparent conflicts between VE testimony and the DOT that goes beyond "simply asking the VE whether his testimony is consistent with the DOT." *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1356 (11th Cir. 2018); *Lockwood v. Comm'r of SSA*, 914 F.3d 87, 92-93 (2nd Cir. 2019).

Plaintiff contends that the "shaky VE testimony", not fully consistent with earlier VE testimony and at least in part in contradiction with the DOT, should have required some discussion of how the ALJ reconciled it in his final decision. Instead, the ALJ only addressed this conflict and the objections raised by Plaintiff's representative in the form of a brief footnote:

> It is noted, following the second hearing, the claimant's representative filed a "Contention Regarding Recent Hearing" in which he appears to challenge the vocational expert's testimony. However, it does not appear the claimant's representative ever formally objected to the vocational expert's testimony. Further, no objections to the vocational expert's testimony were raised at the hearing. In addition, the claimant's representative filed this "Contention" after the record had closed. As such, any arguments raised regarding the vocational expert's testimony are hereby OVERRRULED.

(Tr. 16.) Plaintiff points out that the objection to VE testimony was clear in the substance of the "contention" of Plaintiff's representative, even though he did not explicitly use the word

18

"objection." Additionally, the ALJ's requirement that any such argument be advanced before the record was closed would seem impossible, as Plaintiff was not notified in advance of how the VE would testify or what sources would be used, and therefore could not have provided an appropriate/full rebuttal at the time of the hearing itself.[3] *See McDaniel v. Celebrezze*, 331 F.2d 426, 428-29 (4th Cir. 1964) ("In accordance with the provisions of [the Administrative Procedure Act] the claimant's counsel was afforded an opportunity to challenge and to contradict the publications considered by the Appeals Council"). In any event, no objection by Plaintiff's representative was needed to require the ALJ to resolve the conflicts in occupational information as mandated by SSR 00-4p.

For all the above reasons, remand is required so that the ALJ can resolve the conflicts and issues regarding the VE testimony, as raised by Plaintiff herein and in the post-hearing "Contention".

Next, Plaintiff argues that the ALJ erred by failing to explain his rejection of the consultative examiner's medical opinion. For claims filed after March 27, 2017, as is the case here, the Social Security Administration provides that its adjudicators must weigh medical source statements under the rules set out in 20 C.F.R. §§ 404.1520c and 416.920c. "The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96- 8p. The agency's regulations require an ALJ to consider any medical opinions provided by a medical source using several factors, including supportability, consistency,

---

[3] Additionally, the hearing was held telephonically, due to Covid protocols, which can be a bit challenging, and it would have been reasonable for the ALJ to have accommodated this by at least considering the post-hearing arguments raised by counsel.

relationship with the claimant, and specialization. 20 CFR 416.920c (c) (1) – (5). The most important factors considered when determining the persuasiveness of a medical source opinion are supportability and consistency. 20 CFR 416.920c (b) (2). Therefore, an ALJ must "explain how [they] considered the supportability and consistency factors for a medical source's opinions . . . in [the claimant's] determination or decision." An ALJ may explain how they considered the other factors, but this is not required. *Id*.

Where opinions are equally well-supported and consistent with the record, the agency explains that an examining relationship should be considered as a factor in favor of an opinion because a "medical source may have a better understanding of [a claimant's] impairment(s) if he or she examines [the claimant] than if the medical source only reviews evidence in [the claimant's] folder." 20 CFR 416.920c (c)(3) (v). Furthermore, a treating relationship may demonstrate that a "medical source has a longitudinal understanding of [the claimant's] impairment(s)," taking into account sub-factors like the length of the treatment relationship, the frequency of examinations, the purpose of the treatment relationship, and the extent of the treatment relationship. 20 CFR 416.920c (c) (3) (i) – (iv). It is well-settled that to enable meaningful review, an ALJ must build a logical and accurate bridge between evidence and conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013).

In the present case, Dr. R. Gupta provided a consultative examination on September 4, 2018. (Tr. 638.) Dr. Gupta observed spinous and paraspinal tenderness in Plaintiff's lumbar and cervical region, restricted range of motion in the lumbar region, pain and stiffness in the right shoulder with decreased range of motion, and an inability to walk heel-to-toe or tandemly without

difficulty. (Tr. 637.) Dr. Gupta concluded that Plaintiff "has difficulty doing work related [sic] activities such as sitting, standing, walking, lifting, carrying[,] and handling objects due to lower back, neck, and right shoulder pain." (Tr. 638.) The ALJ cursorily addressed this opinion:

> Likewise, the undersigned find the opinion of R. Gupta, M.D., a consultative medical examiner, is not persuasive. This opinion was based on only one examination. Further, Dr. Gupta did not provide any specific functional limitations. It also appears his opinion was based primarily on claimant's subjective complaints of pain.

(Tr. 15)(internal citation omitted).

Plaintiff argues that the ALJ failed to specifically address the two core factors used in weighing medical opinions: supportability and consistency. Plaintiff points out that the ALJ does not cite to anything in the record that suggests how Dr. Gupta's opinion was erroneous. Plaintiff notes that Dr. Gupta specifically cited pain in the lower back, neck, and right shoulder to support his proposed limitations, and these elements are all established in his own examination. Plaintiff further notes that there is no evidence at all to support the ALJ's holding that Dr. Gupta's opinion "was based primarily on claimant's subjective complaints of pain' as the limitations that Dr. Gupta provided are specifically based on pain in specific regions of the body that was reproducible on physical exam. These limitations are also specifically provided in a section labeled "MEDICAL SOURCE STATEMENT" and so should be seen as intending to reflect Dr. Gupta's own medical opinion. Additionally, as Plaintiff points out, the ALJ misapplied the only factor that he explicitly considered as he faulted the opinion for being "based on only one examination." Yet the agency's own regulations provide that a "medical source may have a better understanding of [a claimant's] impairment(s) if he or she examines [the claimant] than if the medical source only reviews evidence in [the claimant's] folder." 20 CFR 404.1520c (c) (3) (v).

21

Thus, the existence of an examining relationship is a factor in favor of this opinion.

Plaintiff acknowledges that Dr. Gupta's opinion is vague[4]. However, as the Seventh Circuit has ruled regarding a treating doctor's opinion, "although a medical opinion on an ultimate issue such as whether the claimant is disabled is not entitled to controlling weight, the ALJ must consider the opinion and should re-contact the doctor for clarification if necessary." *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004) (citing SSR 96-5p (rescinded)). The ALJ certainly could have re-contacted his own agency's consultants. Thus, the ALJ could have followed his agency's own explicit policy in re-contacting the consultative examiner to clarify this vague opinion. Importantly, "vagueness" does not suggest inconsistency or a lack of supportability—rather, the opinion lacks in specificity, in granular and detailed articulations of limitations.

The Seventh Circuit has stated that an "ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a

---

[4] Plaintiff raises a good point regarding Dr. Gupta's opinions:

> It seems especially unfair that the Commissioner continues to rely on Dr. Gupta for evaluation and opinion evidence but then uses the excuse that Dr. Gupta's opinions are too vague. The rational solution would be to require Dr. Gupta to provide more explicit limitations or to simply stop contracting with Dr. Gupta altogether, rather than continuing to produce vague but disabling opinions that an ALJ then ignores, not for lack of supportability or consistency, but for vagueness.

Plaintiff Reply Brief at 5. This Court has noted several times that Dr. Gupta's opinions are vague, leading to the Commissioner's unpersuasive argument that the opinions should simply be ignored. *See Dalessandro v. Saul*, 2:20-CV-27-HAB (N.D. Ind. March 2, 2021); *Nichole P. v. Saul*, 3:20-CV- 152-JVB (N.D. Ind. March 5, 2021); *Washington v. Colvin*, 2:14-CV-421-PRC (N.D. Ind. February 29, 2016). Clearly, if the Agency is going to pay a doctor for a consultative examination, the Agency should instruct the doctor on the proper detail required to render the opinion useful.

non-examining physician does not, by itself, suffice." *Gudgel v. Barnhart*, 345 F.3d 467 (7th Cir.

2003) (citing *Moore v. Barnhart*, 278 F.3d 920, 924 (9th Cir. 2002)). Furthermore, it has

remarked that "rejecting or discounting the opinion of the agency's own examining physician

that the claimant is disabled can be expected to cause a reviewing court to take notice and await a

good explanation here for this unusual step." *Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir.

2014). Here, the ALJ had a potentially disabling opinion from a consultative examining source

and simply rejected it for vagueness, with minimal analysis, rather than making the barest of

attempts to seek clarification. Thus, remand is required so that the ALJ may properly weigh the

opinion of the examining physician.

Next, Plaintiff argues that the ALJ failed to have a medical expert review new treatment

records. At both the initial and reconsideration levels, state agency consultants limited Plaintiff to

light work with additional postural limitations. (Tr. 97-98, 112-13.) The most recent medical

record review by a non-examining state agency consultant was on January 15, 2019. (Tr. 114.)

Thus the consultants could not have reviewed Dr. Ho's pain management treatment records from

Plaintiff's visits in February, March, and April of 2019. (Tr. 1044, 1051, 1055.)

The ALJ clearly recognized that the state agency consultants' opinions were no longer

sufficient. He explicitly found those opinions to be "not persuasive." (Tr. 15.) He explained:

> While these findings may have been supported by the objective evidence reviewed
> by these doctors, they are not consistent with all the other evidence in the record
> from all other sources. These consultants did not have the benefit of reviewing the
> entire record, as evidence was submitted after their findings were given.
> Furthermore, the State agency medical consultants did not have the benefit of
> personally examining the claimant or hearing her testimony, and therefore could
> not adequately consider her subjective complaints. As such, the undersigned finds
> the claimant is more limited than opined by these consultants.

Also, as discussed above, the ALJ rejected the potentially disabling opinion of the consultative examiner (Tr. 15), leaving the ALJ without a medical opinion to rely on. The ALJ recognized that Plaintiff's impairments had worsened, and he recognized that more restrictive limitations were warranted, but he was not willing to credit Plaintiff's testimony.

The Seventh Circuit has established that an ALJ may not make medical determinations, as "there is always a danger when lawyers and judges attempt to interpret medical reports and that peril is laid bare here." *Israel v. Colvin*, 840 F.3d 432 (7th Cir. 2016); citing *Browning v. Colvin*, 766 F.3d 702, 705 (7th Cir. 2014) (noting that administrative law judges are not permitted to "play doctor"); *see also Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003); *McHenry v. Berryhill*, 911 F.3d 866, 871-872 (7th Cir. 2018) (holding that "an ALJ may not conclude, without medical input, that a claimant's most recent MRI results are 'consistent' with the ALJ's conclusions about her impairments") (citing *Akin v. Berryhill*, 887 F.3d 314, 317-18 (7th Cir. 2018)). Here, the ALJ acknowledged that new medical evidence had so dramatically changed the picture that he could no longer rely on the opinions of the nonexamining physicians, and he then impermissibly interpreted the significance of the new medical evidence on his own.  Thus, remand is required on this issue so that the new medical evidence can be submitted for proper medical scrutiny.

24

<u>Conclusion</u>

On the basis of the foregoing, the Decision of the Commissioner is hereby REVERSED

AND REMANDED for further proceedings consistent with this Opinion.

Entered: December 31, 2021.

s/ William C.  Lee
William C. Lee, Judge
United States District Court